## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

RAFAEL GUILLEN,               §
TDCJ # 01520661,              §
     Petitioner,           §
                          §
v.                            §          EP-14-CV-136-KC
                          §
WILLIAM STEPHENS,             §
Director, Texas Department of §
Criminal Justice, Correctional §
Institutions Division,        §
     Respondent.          §


### MEMORANDUM OPINION AND ORDER


This matter is before the Court on Petitioner Rafael Guillen's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1).[1]  In his petition, Guillen, a state prisoner at the

French Robertson Unit in Abilene, Texas, challenges, through his counsel, Respondent William

Stephens's custody over him based on a conviction in the 205th Judicial District Court of El Paso

County, Texas, for capital murder.[2]  Guillen asserts his trial counsel provided constitutionally

ineffective assistance.[3]  Stephens contends Guillen's "claim must fail and be denied as without

---

[1] "ECF No." in this context refers to the Electronic Case Filing number for documents docketed in this case.  Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

[2] *State v. Guillen*, Cause No. 20070D05440 (205th Dist. Ct. El Paso Cnty., Tex. June 13, 2008), *aff'd*, No. 08-08-00241-CR, 2010 WL 2949954 (Tex. App.–El Paso July 28, 2010, pet. ref'd Dec. 8, 2010).  *See also Ex parte Guillen*, No. WR-77,584-01, 2014 WL 1396166 (Tex. Crim. App. Apr. 9, 2014).

[3] Pet'r's Pet. 7, ECF No. 1, Apr. 16, 2014.

merit."[4]  After carefully reviewing the record and for the reasons discussed below, the Court

finds Guillen is not entitled to § 2254 relief.  The Court will accordingly deny Guillen's petition

and decline to certify his issues for appeal.

## BACKGROUND AND PROCEDURAL HISTORY

On January 28, 2000, Mercedes Caballero's neighbor found her lifeless body on the floor

of her modest home in El Paso, Texas.  Caballero's mouth, neck, hands, thighs, and ankles had

been bound with duct tape.  Her bloody body had been punctured with twenty stab wounds.  The

police had no leads; they found no sign of a forced entry or latent fingerprints.  Caballero's

brother suggested that they interview Ana Montti-Almarez,[5] a woman he described as hostile to

his sister.  A crime stoppers tip gave them Montti-Almarez's phone number in El Paso and her

address in Juarez, Chihuahua.  The phone number led the police to Primavera Baltazar,[6] a friend

of Montti-Almarez.  Then, the homicide detective in charge of the investigation, Art Perez,

received information from a Drug Enforcement Administration special agent in Houston, Texas,

which led him to a witness who identified Guillen as the possible killer.  Detective Perez also

learned that Montti-Almarez, a native of El Salvador with links to the Carrillo Fuentes drug

cartel, believed that her husband was having an affair with Caballero.  After piecing together all

the evidence, Drug Enforcement Administration Detective Perez concluded that Montti-Almarez

and Baltazar had agreed to pay Guillen to murder Caballero, and he secured arrest warrants for

all three.

---

[4] Resp't's Answer 19, ECF No. 9, July 31, 2014.

[5] Mexican authorities briefly detained Montti-Almarez, but released her before authorities
in the United States could complete the extradition process.

[6] A jury found Baltazar guilty of capital murder for her role in Caballero's murder and the
trial court sentenced to the mandatory term of life in prison.  *See Baltazar v. State*, No.
08-02-00447-CR, 2004 WL 1078502 (Tex. App.—El Paso May 13, 2004).

More than four years later, on January 25, 2007, deputy United States Marshals accepted custody of Guillen from Mexican officials at an airport in Mexico City, accompanied him on a flight to the United States, and released him to police detectives in El Paso.  After voluntarily waiving his *Miranda* rights, Guillen made two videotaped statements.  Although the detectives who interviewed Guillen claimed they did not give him any details and did not show him any photographs,[7] Guillen accurately described the crime scene, including information about Caballero's house and cause of her death.  In the first statement,[8] Guillen explained that when he first met Montti-Almarez in Juarez, she told him that Caballero was messing with her husband and talking to the police about her drug business, and that she wanted her dead.  Guillen said that he agreed to murder Caballero for $10,000, but, without telling Montti-Almarez, he hired another man called "el Moreno"[9] to actually kill her .  He added that after he reported Caballero's death to Montti-Almarez, she paid him $20,000.  In the second statement,[10] Guillen admitted that he went to Caballero's house with "el Moreno" and threatened her with a pistol.  He then claimed that "el Moreno" bound Caballero with tape and stabbed her multiple times while he waited inside the garage to ensure that no one else entered the house.  After the killing, he said the men left the home and fled to Juarez.

A state grand jury indicted Guillen for capital murder.  The indictment alleged that Guillen caused Caballero's death for remuneration by stabbing her with a knife.  In the alternative, it alleged that he employed "el Moreno" for remuneration to murder Caballero.

---

[7] Trial Tr., vol 6, p. 103 (Direct Examination of Arturo Ruiz), p. 107 (Direct Examination of Gonzalo Chavarria).

[8] Trial Tr., vol 7, State's Ex. 67 (First Interview of Rafael Guillen).

[9] Law enforcement authorities never located "el Moreno."

[10] Trial Tr., vol 7, State's Ex. 68 (Second Interview of Rafael Guillen).

Guillen pleaded not guilty.  The trial court overruled Guillen's motion to suppress his statements

to the El Paso detectives and he proceeded to trial.

During the trial, Detective Perez testified, during cross examination by Guillen's attorney,

that Montti-Almarez had paid for Caballero's murder:

> A.      The information that was given to me by all of these calls received
>         and the witnesses that the motive for the murder of Ms. Caballero was
>         the result of an allegation that Ms. Caballero was having an affair
>         with Ana Montti-Almarez's husband.
>
>         . . . .
>
> Q.      Wouldn't you describe this homicide as a crime of passion, all that
>         many stab wounds, the way there were doing it?
>
> A.      Well, yes, the information that I received was that the murderer was
>         given specific instructions that the victim knew exactly why she was
>         being stabbed.  So with that information and based on the extent of
>         the injuries, serious injuries, that kind of corroborated over the
>         information that I had received.
>
> Q.      So your information that you had received that Ana Montti was
>         responsible ultimately for this?
>
> A.      She was the one that paid for the murder, yes, sir.
>
> Q.      Paid for the murder.  And that she wanted the victim to know why
>         this was happening.  She wanted her to know, in other words, she
>         wanted her to realize she was being punished for this affair with her
>         husband, correct?
>
> A.      That's correct, sir.[11]

Guillen testified that he made up the story about Caballero's murder because the

detectives told him he would get off if he gave them evidence against Montti-Almarez.  He

---

[11] Trial Tr., vol. 5, pp. 40–42 (Cross Examination of Art Perez).

claimed that while Montti-Almarez had asked him to kill Caballero, she subsequently told him that she had decided to hire a professional for the job:

> Q.     Okay.  When you went to that party did anyone approach you and ask you to do anything?
>
> A.     Well, everybody was having a good time, you know, we are all drinking, partying.  And Gabriella [Barrio] got next to me and was talking about they wanted, you know, to kill a person because of a drug situation and stuff like that.  And an affair that they thought that Ana was having.
>
> Q.     Okay.  An affair that Ana was having.
>
> A.     I mean that Ana's husband was having.
>
> Q.     Okay.  And who was he allegedly have an affair with?
>
> A.     With Caballero.
>
> Q.     Which was the deceased?
>
> A.     Yes.
>
> Q.     In this case?
>
> A.     Yes.
>
> Q.     Did you know her name at the time or anything?
>
> A.     No.
>
> Q.     Okay.  Now, were you intoxicated at the party?
>
> A.     Yeah.
>
> Q.     And what did you say in response to them proposing this to you?
>
> A.     Well, they didn't propose it.  They were just talking about it.  And Gabriella told me, "Hey, why don't you do it?"  In Spanish.  Why don't you do it, you know, I was drunk, having fun, yeah, I will do it, I don't care, trying to act all bad.

> I mean they looked like this was, you know, like cartel people and stuff like that.
>
> Q.  Did you see any guns at that party?
>
> A.  Oh, yeah, there was a lot of AK-47's, different type of guns.
>
> Q.  How would you describe the people that attended the party?
>
> A.  Some were dressed like cops, some regular, they were all doing drugs, drinking.
>
>  . . . .
>
> Q.  Okay.  Now, you said – did you return to Tijuana?
>
> A.  Yes.
>
> Q.  And did you have occasion to come to Juarez again?
>
> A.  I came one more time.
>
> Q.  Okay.  And when was that?
>
> A.  Sometime in January, like almost the end of January.
>
> Q.  Okay.  And were any propositions made to you at that time?
>
> A.  No.  Actually Ana told me that she didn't want nothing done no more, that she was going to get some professional person to do it.[12]

After hearing all the evidence and arguments of counsel, the jury found Guillen guilty, and the trial court sentenced him to life in prison.

In his direct appeal Guillen claimed, among other things, that the evidence was legally insufficient to support his conviction for capital murder.  He explained the only evidence that the offense was a capital murder—as opposed to simply murder—was his extrajudicial confession to

---

[12] Trial Tr., vol. 6, pp. 12–15 (Direct Examination of Rafael Guillen).

the El Paso detectives.  He argued there was no other admissible evidence establishing the

element of remuneration, a necessary element of the *corpus delicti* of a capital murder case.  The

Texas Eighth Court of Appeals rejected this argument:

> At trial, Perez testified that the victim was having an affair with Ana's husband and that the killer was given specific instructions so that the victim knew why she was being killed.  The information he received and the extent of the victim's injuries led him to believe that the murder was a crime of passion.  The detective also testified that Ana was responsible for the murder and paid for it.  In rebuttal, Appellate argues that there is no evidence of remuneration other than this statement and that the testimony is speculative hearsay.  We disagree.  Hearsay admitted without objection has probative value.  *Chambers v. State*, 711 S.W.2d 240, 247 (Tex. Crim. App. 1986).  The testimony of Detective Perez has probative value and renders the commission of capital murder for remuneration more probable than it would be without the evidence.  *See Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); *Chambers v. State*, 866 S.W.2d 9, 15–16 (Tex. Crim. App. 1993).[13]

The Eighth Court of Appeals accordingly affirmed the judgment, and the Texas Court of

Criminal Appeals denied Guillen's petition for discretionary review.[14]

The Court of Criminal Appeals remanded Guillen's application for a writ of habeas

corpus back to the trial court for an evidentiary hearing on whether Guillen's counsel provided

ineffective assistance when he failed to object to Detective Perez's testimony:

> Applicant, through habeas counsel, raises a claim of ineffective assistance of trial counsel.  He complains that trial counsel failed to object to portions of a detective's testimony as being inadmissible hearsay.  Applicant argues that had an objection been lodged, the detective's testimony would not have been admitted, and the remaining evidence would have been insufficient to corroborate accomplice testimony linking Applicant to the crime.  Applicant

---

[13] *Guillen v. State*, No. 08-08-00241-CR, 2010 WL 2949954, at *7 (Tex. App.—El Paso 2010).

[14] *In re Guillen*, PD-1331-10, 2010 Tex. Crim. App. LEXIS 1633, at *1 (Tex. Crim. App. 2010).

concludes that without the accomplice testimony, there was insufficient evidence of guilt and that a judgment of acquittal would have been ordered on direct appeal but for counsel's deficiency in not objecting.[15]

The trial court was unable to obtain an affidavit from Guillen's attorney, but submitted its own findings and conclusions. It determined that the *corpus delicti* requirements were satisfied since Guillen's judicial confession—that "Montii-Almarez told him that she was going to get a profession to kill the victim"—was an admission by a party opponent, and that Guillen's extrajudicial confession to the detectives was "sufficiently corroborated by his trial testimony."[16] The trial court also noted that Guillen's own counsel had elicited Detective Perez's testimony that Montii-Almarez paid to have Caballero killed in an attempt to "cast the victim in an unfavorable light" and to "cast this offense as a drug-related murder."[17] Guillen filed objections to the trial court's findings and conclusions, but the Texas Court of Criminal Appeals denied him relief.[18] "In reaching this holding, this Court expresses no opinion regarding whether the *corpus delicti* rule is applicable to the remuneration element of the capital murder and holds only that the evidence in Applicant's case was sufficient to corroborate his confession as to remuneration, even assuming that the rule applies."[19] The instant federal petition followed.

In his petition, Guillen asserts that his trial counsel provided constitutionally ineffective

---

[15] *Ex parte Guillen*, No. WR-77,584-01, 2012 WL 4449655, at *1 (Tex. Crim. App. 2012).

[16] State Writ R. 93–94 (Findings of Fact, Conclusions of Law and Order to the Trial Court Clerk), *Ex parte Guillen*, No. WR-77,584-01.

[17] *Id.* at 94.

[18] *Ex parte Guillen*, No. WR-77,584-01, 2014 WL 1396166 (Tex. Crim. App. Apr. 9, 2014).

[19] *Id.* at *1.

assistance when he failed to object to hearsay testimony given by Detective Perez, who told the jury his investigation showed that Guillen committed the murder for remuneration. Guillen argues that, without Perez's objectionable testimony, there was insufficient evidence to prove that the murder was for remuneration, and that it was a capital offense.

## APPLICABLE LAW

### A.    28 U.S.C. § 2254

"[C]ollateral review is different from direct review,"[20] and the writ of habeas corpus is "an extraordinary remedy"[21] reserved for those petitioners whom "society has grievously wronged."[22]  It "is designed to guard against extreme malfunctions in the state criminal justice system."[23]  It provides an important, but limited, examination of an inmate's conviction and sentence.[24]  Accordingly, the federal habeas courts' role in reviewing state prisoner petitions is exceedingly narrow.  "Indeed, federal courts do not sit as courts of appeal and error for state court convictions."[25]  They must generally defer to state court decisions on the merits[26] and on procedural grounds.[27]  They may not grant relief to correct errors of state constitutional, statutory,

---

[20] *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).

[21] *Id.*

[22] *Id.* at 634.

[23] *Id.* (citing Justice Stevens's concurrence in *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

[24] *See Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions.").

[25] *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

[26] *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[27] *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998).

or procedural law, unless a federal issue is also present.[28]

A federal court can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law,' "[29] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[30]  The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[31]

Moreover, the federal court's focus is on the state court's ultimate legal conclusion, not whether the state court considered and discussed every angle of the evidence.[32]  Indeed, state courts are presumed to know and follow the law."[33]  Factual findings, including credibility choices, are entitled to the statutory presumption, so long as they are not unreasonable "in light of the evidence presented in the State court proceeding."[34]  Further, factual determinations made by a state court enjoy a presumption of correctness which the petitioner can rebut only by clear and

---

[28] *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).

[29] *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)).

[30] 28 U.S.C. § 2254(d)(2) (2012).

[31] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[32] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("we review only the state court's decision, not its reasoning or written opinion").

[33] *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

[34] 28 U.S.C. § 2254(d)(2).

convincing evidence.[35]  The presumption of correctness applies not only to express findings of fact, but also to "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."[36]

In sum, the federal writ serves as a "guard against *extreme malfunctions* in the state criminal justice systems," not as a vehicle for error correction.[37]  "If this standard is difficult to meet, that is because it was meant to be."[38]

### B.   Ineffective Assistance of Counsel

To prove an ineffective-assistance-of-counsel claim, a petitioner must satisfy both prongs of the test announced in *Strickland v. Washington*[39] by showing not only constitutionally deficient performance by counsel, but also actual prejudice to his legal position.[40]  The Court need not address both components if the petitioner makes an insufficient showing on one.[41]  To demonstrate deficiency, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[42]  A

---

[35] 28 U.S.C. § 2254(e)(1); *see Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting that a state court's determination under § 2254(d)(2) is a question of fact).

[36] *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

[37] *Harrington v. Richter*, 562 U.S. 86, 131 S.C. 770, 786 (2011) (citation omitted) (emphasis added).

[38] *Id.*

[39] *Strickland v. Washington*, 466 U.S. 668, 689–94 (1984).

[40] *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (summarizing the *Strickland* standard of review).

[41] *Strickland*, 466 U.S. at 697.

[42] *Id.* at 687.

-11-

court considering such a claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."[43]  To demonstrate prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[44]  A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*.[45]  The probability "of a different result must be substantial, not just conceivable."[46]  Thus, counsel's performance is entitled to "a heavy measure of deference" by a reviewing court.[47]

Moreover, the Court must review a petitioner's ineffective-assistance-of-counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d),"[48] and consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold."[49]  Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable":[50]

---

[43] *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011) (citation omitted).

[44] *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (internal quotation marks and citation omitted).

[45] *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).

[46] *Richter*, 131 S.Ct. at 792.

[47] *Cullen v. Pinholster*, 131 S.Ct. 1388, 1408 (2011) (internal quotation marks and citation omitted).

[48] *Id.* at 1403.

[49] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

[50] *Richter*, 131 S. Ct. at 785.

The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.[51]

## ANALYSIS

In his petition, Guillen asserts that his trial counsel provided constitutionally ineffective assistance when he failed to object to hearsay testimony of Detective Perez, who told the jury he concluded, based on his investigation, that Guillen had murdered Caballero for remuneration. Guillen argues that, without Perez's testimony, the evidence was insufficient to prove that the murder was for remuneration and, therefore, a capital offense.

The trial court concluded the *corpus delicti* requirements were satisfied since Guillen's judicial confession—that "Montii-Almarez told him that she was going to get a profession to kill the victim"—was an admission by a party opponent, and Guillen's extrajudicial confession was "sufficiently corroborated by his trial testimony."[52] Guillen also knew quite a bit about the crime scene, including details of the inside of Caballero's house and the fact that Caballero, whom he did not know, had been bound with tape and stabbed multiple times. While Guillen claimed his interrogators showed him the crime scene photographs and gave him details of the crime,[53] the detectives who interviewed him maintained they did not give him any details and did not show

---

[51] *Id.* at 788.

[52] State Writ R. 93–94 (Findings of Fact, Conclusions of Law and Order to the Trial Court Clerk), *Ex parte Guillen*, No. WR-77,584-01.

[53] Trial Tr., vol. 6, pp. 36, 85 (Direct and Cross Examination of Rafael Guillen).

him any photographs.[54]  Moreover, whether counsel was deficient depends on whether and to

what extent the *corpus delicti* rule applies, which is a question of state law.[55]  When the Court of

Criminal Appeals denied his state writ application, it explained, "[i]n reaching this holding, this

Court expresses no opinion regarding whether the *corpus delicti* rule is applicable to the

remuneration element of the capital murder and holds only that the evidence in Applicant's case

was sufficient to corroborate his confession as to remuneration, *even assuming that the rule*

*applies*."[56]

　　In short, there is "some evidence," independent of Detective Perez's testimony,

corroborating remuneration.  Consequently, the alleged deficient performance by counsel did not

prejudice Guillen.  The Court of Criminal Appeals accordingly concluded "[b]ecause Applicant

has not demonstrated that he was harmed by counsel's alleged deficient performance in failing to

object, this Court holds that his ineffective assistance of counsel claim lacks merit."[57]

　　Furthermore, the Court must review Guillen's ineffective-assistance-of-counsel claim

"through the deferential lens of [28 U.S.C.] § 2254(d),"[58] and consider not only whether the state

court's determination was incorrect, but also "whether that determination was unreasonable—a

---

[54] Trial Tr., vol 6, p. 103 (Direct Examination of Arturo Ruiz), p. 107 (Direct Examination of Gonzalo Chavarria).

[55] *See Carrizales v. State*, 414 S.W.3d 737, 740–41 (Tex. Crim. App. 2013) (discussing common-law origins of *corpus delicti* rule); *Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983) ("[S]uch a state rule of '*corpus delicti*' has no independent constitutional footing.").

[56] *Ex parte Guillen*, No. WR-77,584-01, 2014 WL 1396166, at *1 (Tex. Crim. App. Apr. 9, 2014) (emphasis added).

[57] *Id.*

[58] *Id.* at 1403.

substantially higher threshold."[59]  Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."[60]  In this case, Guillen has failed to provide clear and convincing evidence that the Court of Criminal Appeals' application of *Strickland* was unreasonable.  Guillen is, therefore, not entitled to § 2254 relief on his claim.

## EVIDENTIARY HEARING

A court will hold an evidentiary hearing on a § 2254 petition only when the petitioner shows either (1) the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or (2) a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  Guillen does not assert that either prerequisite for a hearing exists in his case.  The record is adequate to dispose fully and fairly of Guillen's claim.  The Court need inquire no further on collateral review and an evidentiary hearing is not necessary.

## CERTIFICATE OF APPEALABILITY

A petitioner may not appeal a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability."[61]  Further, appellate review of a habeas petition is limited to the issues on which a certificate of appealability is granted.[62]  In other

---

[59] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

[60] *Richter*, 131 S. Ct. at 785.

[61] 28 U.S.C. § 2253(c)(1)(B) (2012).

[62] *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that, in regard to the denial of relief in habeas corpus actions, the scope of appellate review is limited to the issues on which a certificate of appealability is granted).

words, a certificate of appealability is granted or denied on an issue-by-issue basis, thereby limiting appellate review solely to those issues on which a certificate of appealability is granted.[63] Although Guillen has not yet filed a notice of appeal, this Court nonetheless must address whether he is entitled to a certificate of appealability.[64]

A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[65]  In cases where a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[66]  To warrant a grant of the certificate as to claims that the district court rejects solely on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural

---

[63] *See* 28 U.S.C. § 2253(c)(3) (setting forth the narrow scope of appellate review in habeas corpus matters); *see also Lackey*, 116 F.3d at 151 (holding that a certificate of appealability is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *but see United States v. Kimler*, 150 F.3d 429, 431 n.1 (5th Cir. 1998) ("We have decided, however, that the monolithic nature of [Federal Rule of Appellate Procedure] Rule 22(b) in conjunction with Congress's mandate for issue specificity on collateral review embodied in 28 U.S.C. § 2253(c)(3) requires a more express request.  In order to obtain appellate review of the issues the district court refused to certify, the petitioner must first make the threshold substantial showing of the denial of a constitutional right. *See* 28 U.S.C. 2253(c)(2).  Only after clearing this hurdle may the petitioner proceed to brief and we review the merits of the rejected issues.").

[64] *See* 28 U.S.C. foll. § 2255 Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

[65] 28 U.S.C. § 2253(c)(2).

[66] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* to a certificate of appealability determination in the context of § 2255 proceedings).

ruling.'"[67]  Here, Guillen is not entitled to a certificate of appealability because reasonable jurists would not find debatable the Court's conclusions that he has not made a substantial showing of the denial of a constitutional right.  Accordingly, the Court finds that it should deny Guillen a certificate of appealability.

### CONCLUSION AND ORDERS

The Court concludes that Guillen is not entitled to § 2254 relief.  The Court further concludes that Guillen is not entitled to a certificate of appealability.  Accordingly, the Court enters the following orders:

**IT IS ORDERED** that Guillen's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) is **DENIED**, and his cause is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Guillen is **DENIED** a certificate of appealability.

**IT IS ALSO ORDERED** that all pending motions are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk shall **CLOSE** this case.

**SO ORDERED.**

**SIGNED** this 6th day of July 2015.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

---

[67] *Slack*, 529 U.S. at 484.